George Andrews, J.,
delivered the opinion of the Court.
Some years previous to the year 1843, the shifting current of the Mississippi Eiver had left along its bank, in front of :< pm-t-hv <»f the town of Memphis, an extensive i! of -alluvium, locally known as the batture.
Tiiis jH-n-euon naturally became the subject of contest and litigation. It was claimed, first by the original grantees of the soil of the river bank, claiming it as alluvion which accrued to them as riparian owners: second, by the corporation of Memphis, claiming it in virtue of some previous dedication of the original river bank to public uses; and third, by certain parties who had entered the newly made soil as vacant and unappropriated land, and claimed to have received warrants therefor from some source — perhaps from the State of North Carolina.
In March, 1843, Congress authorized the ■ Secretary of the Navy to cause an examination and survey to be made of the harbor of Memphis, “in reference to the expediency of establishing a Naval Depot and Yard, for the building and repairing steamships and other vessels of war at that place.” A board of naval, officers was immediately appointed to make the examination and survey, and on the 4th of May, 1843, made their report *486 to the Secretary of tbe Navy, recommending the estab-hshment of a naval depot. They selected and surveyed as suitable for this purpose, a tract of land upon the bank of the Mississippi Biver, including the premises now in dispute, and embracing an area of eighty-two and one-half acres. The tract thus selected was mostly upon the batture above mentioned, and on the waters of • the harbor, but embraced a tier of city lots lying along the original bank of the river. The batture was subject to inundation, and the board of officers reported that it would require to be filled up to a considerable height, and protected from the current of the river by piles and embankments.
Great interest was felt by the citizens of Memphis, then a town of about four thousand inhabitants, in the proposition to establish a navy yard or naval depot at that place, and strenuous efforts were made to induce Congress to make such location.
On the 4th of May, 1843, the same day on which the report of the board of naval officers above mentioned bears date, the Mayor and Aldermen of .the town of Memphis passed an ordinance, authorizing the Mayor to convey, to the United States, for the consideration of twenty thousand dollars, the tract of land. surveyed by the naval board as above mentioned, for a naval yard and depot, so long as it should be used for that purpose, if said location should be made within two years. No conveyance was ever made, however, under this authority, and the title to the batture was at that time in litigation, and the remainder of the tract was not owned or claimed by the city.
*487 The action of the naval board, and of the Mayor and Aldermen of Memphis, wereduly reported by the Secretary of the Navy to Congress, 'which on the 15th of June, 1844, passed An Act entitled “An A.ct to establish a navy yard and depot at, or adjacent to the City of Memphis/’ &c. This statute enacted that the President be “authorized to select and purchase a site for a navy yard and depot at the City of Memphis, and to erect such buildings, and make such improvements thereon as may be necessary for the construction and repair, and for the accommodation and supply of vessels of war;” and that “he be further empowei’ed to receive any donations of lands, water rights, or rights of way, which the authorities of the City of Memphis” or any other persons, might make or grant to the United States; and the sum of $100,-000 was appropriated for that purpose.
In the month of July, 1844, a deed was executed for the purpose of settling the controversy as to the ownership of the batture, and to secure a site for the contemplated navy yard. The parties of the first part to this deed were the proprietors of the soil of the original bank of the river, in front of which the alluvion had formed. The town of Memphis, under its corporate name of the Mayor and Aldermen of the town of Memphis, was the party of the second part. The persons who had entered the batture as vacant land, were the parties of the third part. Seth ’Wheatly, as trustee, was the fourth party.
This deed recites, “that whereas divers questions have arisen between the three first mentioned parties, as to the ownership of the alluvial land formed by the Mississippi *488 River on the western boundary of the tract of land, Ac., upon which said tract of land the town of Memphis was laid out, the said parties of the first part being the original proprietors of the said town or their representatives; and whereas, the location of the naval depot lately established by the United States at said town, and the general interest of the citizens and property 'holders thereof, requires that the title to that part of the said alluvial land which lies west of the public promenade and public landing as dedicated on the bluff of Memphis by the said original proprietors, shall be withdrawn from the litigation, so that no obstacle shall stand in the way of the immediate commencement of the public works aforesaid; and that the threatened decline and removal of the town may be prevented by affording an opportunity of doing business at the water’s edge:
“Now, therefore, in consideration of the promises, the said parties of the first and third parts, do give and grant unto the said parties of the second part, and their successors, forever, for the location of the naval depot aforesaid, all that portion of the alluvial land within . the limits of the town of Memphis, which lies north of Market street, etc.; and for the same consideration, and the further sum of five dollars, in hand paid, the parties of the first, second and third parts, do give and grant, etc., unto the said party of the fourth part, and his heirs, forever, all the rest and residue of the said alluvial land south of Wolf River, and also that part of the said alluvial land above mentioned and designated for the naval depot, in case the same shall not be appropriated by the United States for that purpose.”
*489 The deed then provided that the trustee, Wheatly, should cause the land conveyed to him to be laid off into lots, a certain portion to be reserved for a public landing; the lots to be sold, and the proceeds divided in certain specified proportions among the parties to the deed. Other provisions of said deed are not material to the present discussion.
Some time after the making of the above mentioned deed, the Mayor and Aldermen of the town of Memphis executed a deed to the United States, conveying in fee, with warranty, for the consideration of $20,000, the premises theretofore selected and surveyed by the board of naval officers. This deed is absolute, and without conditions or reservations of any kind, and does not express upon its face the purposes to which the premises are to be appropriated. It bears date the 14th of September, 1844, but was not acknowledged until January 7, 1845; and probably was not delivered until about the latter date, as it appears from the proceedings of the Mayor and Aldermen, at a meeting in December, 1844, that the United States authorities were not satisfied with the title offered by the city, ■ and had refused to accept it.
The premises surveyed and conveyed to the United States by the deed last mentioned, included a tier of city lots not upon the alluvion in question, and which belonged to various parties. The title to these lots was secured by the city by purchase, after much delay and expense. The $20,000 paid by the United States to the city was undoubtedly intended to cover the expense of securing the title to these lots, as the Mayor and Aider-men, by resolution, offered the premises to the United *490 Stales without any charge, provided they would dispense with these lots.
The United States took possession of the tract thus conveyed to them, in the year 1845. This possession was undoubtedly taken for the purpose, and with the intent of carrying into effect the Act of Congress of June 15th, 1844, authorizing the President to select and procure a site for a navy yard and depot, and to erect such buildings, and make such improvements thereon, as might be necessary for' the construction and repair, and for the accommodation and supply of vessels of war of the United States.
The official report of the Chief of the Bureau of Yards and Docks, made November 22, 1845, shows that at that time, “a commencement of the works at the Memphis Navy Yard has been made, by surveying, laying off and examining the various portions which must first be taken in hand; that estimates had been made, and contracts for various improvements and erections had been allotted, to the amount of about $150,000. The Secretary of the Navy, in his report for the same year, states his opinion that, Memphis being a thousand miles from the sea, is inappropriate as a place of repair of ships of war; but that in building steamships, it might compete with Boston, New York, Philadelphia, St. Louis, Cincinnati or Pittsburg, and that it was a favorable location for the manufacture of cordage. He recommends that Congress confine the use of the moneys it may appropriate, first, to the immediate construction of a rope walk, and next, to simple arrangements for building and equipping steamers.
*491 During the year 1846, extensive operations were being carried on at this place, excavating, driving piles, etc., and large contracts made for labor and material, with a view to the construction of a navy yard proper.
On the 10th of August, 1846, -while these works were being prosecuted, Congress passed An Act making it the duty of the Secretary of the Navy, “in the expenditure of the appropriations made for the Navy Yard at Memphis, to confine the same to the construction of a rope walk.” The passage of this Act, as the Chief of the Bureau of Yards and Docks reports, caused some delay to the work, and embarrassment to the Bureau. Orders were immediately issued to divert as far as possible the then existing contracts, and the materials on hand, from the objects for which they were originally intended, and to make them available for the rope walk. This action of Congress was probably in pursuance of the recommendation of the Secretary of the Navy; and there is nothing to show that the purpose eventually to construct a Navy Yard was at this time, abandoned.
But from this time until 1854, no effort appears to have been made to complete the works, except as a place for the manufacture of cordage for the use of the navy. For this purpose, large appropriations were made from time to time, by Congress,' to the amount of about $800,000. Substantial and elaborate structures were prepared, such as the building for a rope walk, a saw mill, blacksmith’s shop, store house, residence for commanding officer, officers’, quarters, etc. Roads, drains and walls were made, and the finest machinery prepared for the tope walk. During all this time, the establishment was *492 designated in statutes and official reports as the “Navy Yard.” Jurisdiction had been ceded to the United States by the State of Tennessee, and it was under the command of a naval commander of high rank, with a corps of officers — such as purser, surgeon, midshipmen, engineers, etc., and a guard of marines; and the usual etiquette of navy yards was maintained.
In the year 1854, Congress had become tired of the expensive establishment at Memphis. The rope walk had recently been completed so far that the manufacture of cordage had commenced. Much trouble had been experienced in procuring good foundations for buildings, and heavy losses had been incurred thereby; and doubts were felt as to the stability of the foundation of the yard, and as to the • security of the yard against encroachment by the river. Great difficulty was experienced in procuring labor. It was said that the establishment of a navy yard at Memphis was a mistake; that the United States had, besides it, seven navy yards already in operation; that its location was inconvenient, and that it was and would be, practically useless.
On the 5 th of August, 1854, An Act was passed by ■Congress, providing “that all the grounds and appurtenances thereunto belonging, known as the Memphis Navy Yard, in Shelby county, Tennessee, be, and the same is hereby ceded to the Mayor and Aldermen of the City of Memphis, for the use and benefit of said city; and that the Secretary of the Navy order the Commandant of the Navy Yard at Memphis to surrender to the Mayor of Memphis, said property.”
The Mayor and Aldermen, being officially notified of *493 this act of cession, took the question of its acceptance by them into consideration, and on the 12th of September, 1854, passed a resolution accepting the navy yard grounds, as ceded by Congress, and directing the Mayor to notify the Secretary of the Navy of said acceptance; and soon, after, the officer in command delivered possession of the navy yard and appurtenances to a committee appointed for that purpose by the Mayor and Aldermen. From that time to the present, except an occupation by United States troops about the close of the late war, the premises in question have been in the possession of, and claimed by, the Mayor and Aldermen of the City of Memphis.
The bill in this cause, is filed by a great number of persons, being a portion of the parties, or the representatives of parties, of the first part, to the deed of compromise of- 1844. They claim that, by the terms of that deed, the parties thereto became tenants in common, in designated proportions, of the property included in the deed — the title to a portion thereof being placed in the Mayor and Aldermen, as a conduit through which it should pass to the United States, for the location of a naval depot; that the United States did not, in fact, “locate” the naval dcppt upon these premises, or “appropriate” them for that purpose, within the meaning of the compromise deed; and that,, therefore, when the United States re-conveyed the premises to the Mayor and Aldermen, all parties Avere remitted to their original relative positions and rights, and that the title either passed, by the conditions and limitations of that deed, to "Wheatly, the trustee, or that it is held by the Mayor and Al *494 dermen in. trust for their co-tenants; that the city of Memphis is estopped to claim the absolute title, as against the other parties to the compromise deed.
The answer of the Mayor and Aldermen of the City of Memphis denies that complainants have any legal or equitable title to the premises, and insists upon their own perfect title, as well under the conveyance from the United States by Act of Congress, as by the statute of limitations.
The claim of the complainants must be sustained, if at all, upon a finding that the United States held the title to the property upon a trust to use it in a particular manner, which trust they have violated and renounced; or that their title was subject to a condition, upon breach of which it would' be divested.
If the Mayor and Aldermen, in conveying to the United ' States, did not exceed their authority or violate their trust, and if the United States, by that conveyance, and by the location of the depot and the appropriation of the property, acquire a complete and absolute legal and equitable title in fee to the premises in dispute, free from all conditions and limitations, the latter could convey it at their discretion, either to a stranger, or to one of the original owners, and such grantee would acquire a perfect title. All title, legal and equitable, having passed out of the original owners into the United States, and the Mayor and Aldermen having properly discharged the trust which they assumed, the mere fact that the land was originally a donation to the United States, would not entitle one of the donors to recover liis share from the grantee of the United States, whether such grantee were *495 one of the original donors or a stranger, and whether such grantee received the title from the United States as a gift, or upon a purchase for valuable consideration. The circumstances in the case supposed might render it morally fit that the United States should return the property to all the original owners; but if they did not recognize this moral fitness, and act in accordance with it, the courts cannot take notice of it. But if the estate of the United States in the premises was subject to a condition, upon breach of which the estate should cease or might be forfeited, their grantees can stand in no better situation than they. The inquiry, then, is, what estate passed to the United States by the deed executed by the Mayor and Aldermen' of Memphis, in 1844.
The terms of the compromise deed vested the legal estate in fee in the Mayor and Aldermen. No act was required to be done before the estate should vest in them, and there are no words in the deed declaring a condition precedent. But the parties to the deed contemplated that the land was to be appropriated by the United States, and a naval depot located thereon; and the legal title was evidently placed temporarily in the Mayor and Aldermen, for the purpose of being conveyed to the United States, should they conclude to locate the naval depot at that point. This is sufficiently shown by the terms and recitals of the deed.
We cannot, from this expression of the purpose of the conveyance, under the circumstances of this case, declare a trust in the United States, having once located the navy yard, to employ the premises for all future time for the purposes of a navy yard only.
*496 From the nature of the work contemplated, the care exhibited by the United States authorities in the examination of the title, the character of the works to be constructed, the immense outlay requisite in mere preparation of the site, and the very large sums which it was proposed to expend in improvements upon this site, (the first estimates being about two millions of dollars,) we could hardly suppose, even if supposition were admissible, that the United States would have accepted, or that any of the parties expected it to accept, an estate in the land, which would be forfeited if circumstances should, at any future time, render necessary a change of plan, or an abandonment- of the site.
The Mayor and Aldermen, in executing to the United States a deed in fee, and containing no conditions of forfeiture for such abandonment, undoubtedly did' what it was their duty and within their power to do, and what all the parties to the compromise deed expected them to do.
The legal title was, therefore, held by the Mayor and Aldermen in trust to convey to the United States, for the purpose that the latter might locate a naval depot thereon; and when the Mayor and Aldermen made the conveyance for the purpose indicated, the trust was executed as to them.
The United States, however, took the property subject to the obligation implied in the purpose for which the conveyance was made — to “locate” a naval depot thereon, and to “appropriate” the property to the purposes of such a depot. Whether this obligation is to be considered as in the nature of a trust assumed by the *497 United States, or as a condition subsequent, upon breach of which their estate would be forfeited, the result is the same. In either case, if they had failed to locate the depot at the time of their re-conveyance to the Mayor and Aldermen, the legal title passed to the latter, subject to the rights of the original owners, as declared in the compromise deed. But if the United States did locate the depot and appropriate the property, in accordance with the obligation which they assumed and the true meaning of the compromise deed, then the trust was executed, or the condition performed, and their title was thenceforth absolute.
By the terms of the compromise deed, the parties of the first and third parts “give and grant unto the said parties of the second part, and their successors, forever, for the location of the naval depot aforesaid, all that portion of the alluvial land,” etc.
It is claimed for the complainants, that the expression, “for the location of the naval depot,” implies a condition that the estate conveyed should continue only so long as the premises should be used for the purpose indicated; that the premises being conveyed for á specified purpose, the parties must be presumed to have intended to convey only such estate as should suffice for that purpose; and that the estate should cease if the use were perverted.
Such a condition is not expressed or implied in the words above quoted. The words used are not those usually employed to express a condition in grant. Other expressions may be used, however, for this purpose: 1 Washb. Real Prop., 445. The words express clearly the *498 object had in view in making the conveyance. They imply a trust assumed by the Mayor and Aldermen, to permit the premises to be used for the purpose declared; but they neither express nor imply a condition that the estate should cease, if the premises should ever be applied to another purpose. Knowing, from these words, the object which the parties to the deed had in view, we may judge that it would have been very natural ¿and proper that they should have inserted such a condition in their deed: but the words do not, of themselves, express or imply such a condition, and we cannot imply such a condition from the surrounding circumstances.
By another clause of the compromise deed, the parties of the first, second and third parts, convey to Seth Wheatly, as trustee, the premises “designated for the naval depot, in case the same shall not be appropriated by the United States for that purpose.”
This clause created a condition subsequent, while the title was- held by the Mayor and Aldermen previous to the conveyance to the United States; and upon that conveyance the United States must have taken the legal title subject to the same condition — that they should “appropriate” the premises to the purpose -of a naval depot. It becomes necessary, therefore, to examine the nature of that condition, and to ascertain whether it has been broken, and what acts of appropriation will constitute a performance of it.
In this inquiry the intention of the parties, to be ascertained from the terms of the deed, must govern. ¥e may look at the deed in the light of .surrounding circumstances, to enable us to understand the intention *499 which the parties have expressed, but not for the purpose of carrying out an intention which they have not expressed. And a condition which is to operate to determine or forfeit an estate must be expressed or clearly implied in the terms of the deed. 1 Washb. Real Prop., 447.
ISTo time being limited for the performance of this condition, it must be performed within a reasonable time. 1 Washb. Real Prop., 449. But the United States having conveyed the property, and thus put it out of their power to perform in the future, the condition is broken, unless it was performed before they made that conveyance.
We are satisfied that this condition was performed on the part of the United States, within the meaning of the deed in question; that the navy yard was, within the meaning of the deed, “located” upon the premises in controversy, and that those premises -were “appropriated” to the purposes of the navy yard.
Had the works been completed, and actually used as a navy yard and depot, or held in readiness to use for that purpose, this would certainly be an appropriation of the premises to that purpose, and a subsequent change of plan and abandonment of the works would not divest the estate. Whenever the works ' should be completed, and should become, in a true sense, a navy yard and depot, then certainly, if not before, the premises would be “appropriated” to the purposes of a naval depot; and the depot would be “located” on the premises. Both words express simple and single acts, capable of instant completion, and neither conveys the idea of continued action.
*500 The United States undoubtedly took possession of the premises in 1845, in good faith, for the purpose, and with the intention of converting them into a navy yard and naval depot, for the construction, repair and equipment of vessels. Plans and estimates upon a magnificent scale were prepared, and the work of constructing such a navy yard actually commenced.
The condition is not, that the property shall be used and applied in the course of the regular business and offices of a perfect and complete navy yard and depot; but it is, that the grounds “designated for the naval depot” shall be “appropriated for that purpose,” — for that object, end, aim, result, consequence. Webster’s Dictionary.
Property may be appropriated to a particular purpose or object, by applying it to the accomplishment or completion of that purpose or object, though it may, in fact, never be accomplished or completed. A person desiring to build a house may “appropriate” timber and brick to “that purpose,” though the house may never rise above its foundations.
Webster’s definition of the verb to “appropriate” is in perfect accordance with common usage: “To set apart for, or assign to a particular use, in exclusion of all other uses; to take to one’s self in exclusion of others; to claim or use as by an exclusive right; to make peculiar, as to apropriate words to ideas,” etc.
When the United States had received a conveyance in fee of the premises in question, made and accepted for the purpose of constructing a naval depot thereon, and had, in good faith and with the bona fide intent to con *501 struct a naval depot thereon, taken actual possession, and commenced the construction of the naval depot, the property was as actually and effectually appropriated for that purpose, as it could be if the navy yard and depot were in actual operation. And the same acts which amount to an appropriation of the premises for a naval depot, necessarily amount to a “location” of the depot upon those premises. Webster defines the word “locate,” “To place, to set in a particular spot or position; to select; survey and settle the boundaries of a particular traet of land; or to- designate a particular portion of land by limits; to designate and determine the place of.”
Cases may arise in which it is evident that parties have used the word “locate,” to express the completion of the enterprise or structure located; but such is not the usual force of the word, and there is nothing to show that the parties have used it in that sense in this instance.
So far as surrounding circumstances throw any light upon the sense in which these words were used, it is in accordance with the above views. The three first parties to the deed were engaged in compromising and settling their conflicting claims to the premises. They were equally desirous that the navy yard and depot should be located at the point which had been surveyed for that purpose, and were greatly fearful that some other point might be selected for a site. It was uncertain whether the United States would locate the works at this point, or would accept the title which these parties could procure; and it was uncertain what delays might occur. For the convenience of the parties, and to enable them *502 to make a present settlement of their matters, it was agreed that the title to the proposed site should be conveyed to one of the three claimants, to be conveyed to the United States, in case they should conclude to locate their works thereon; and that if the United States did not conclude to accept the premises as a site for their proposed works, and to appropriate them to that purpose, then the premises should go, like the residue of the tract, to a trustee.
There is nothing to show that the parties had in their minds the possibility of a future failure on the part of the United States to keep up these works. On the oontrary, everything tends to show that they had in view the immediate location of the works, the immediate commencement of them, and the immediate appropriation of the premises to the purpose of a naval depot. That all parties acquiesced in this construction for more than twenty years, is a fact entitled to some weight, when, considering the question of intention, the parties to the deed of compromise were extremely fearful that the proposed site would not be accepted by the United States, and were making most strenuous efforts to perfect the title to the satisfaction of the latter, which they had much difficulty in accomplishing. The expression, “location of a naval depot,” was used as correlative with the provision in regard to the appropriation of the property; both had reference to acts capable of fixed accomplishment within a short time in the future. We can not understand from this deed that either of the parties intended thereby acts of location and appropriation of such a nature that it might not be possible for ten, twenty, or *503 fifty years, to ascertain whether they had been completely performed or not.
As the premises were in fact abandoned by the United States, after a few years’ occupation, and the parties were in great measure disappointed as to the benefits which they expected to obtain by the location of the Navy Yard at that place, the complainants’ claim seems at first view to be clothed with a kind of moral equity which demands recognition. But the question is not, what is reasonable now, and what would the parties have stipulated, had they foreseen all that came to pass; but what did they stipulate when these deeds were made, in view of what seemed reasonable then. Had the.United States paid a full consideration for the property, instead of receiving it as a donation, probably no one would contend that under the deeds in question their estate was forfeited, or had terminated by breach of condition. Yet the meaning and effect of the condition is the same, whether the land was paid for or not; and the circumstances of this case do not authorize us to declare that the United States held the property upon an implied trust to employ it for all time for the purposes of a Navy Yard, and for those purposes only.
In fact, all parties undoubtedly expected that the navy yard would b'e fully completed, and that it would not be discontinued or abandoned. But in voluntarily making a title with no condition of forfeiture for a future abandonment, they assumed the risk that subsequent events might necessitate an abandonment.
The city of Memphis was not estopped in consequence of its former relation of claimant of the property, or by *504 entering with the adverse claimants into the compromise deed. When the title had vested absolutely in the United States, all legal and equitable title was divested out of the other parties; and from that moment all relations between those parties, whether of trust or as tenants in common, were at an end, as regards this land.
In the Act ceding the property to the city of Memphis, Congress declared no trust, and mentioned no beneficiary, other than the city of Memphis. In accepting the cession, the city did no act recognizing a trust in favor of any other party. From the mere fact of the conveyance, irrespective of intention, the law does not imply a trust. Whether Congress was aware of the manner in which the title was originally obtained, does not appear; and we can not, by guessing at its knowledge and intention, annex to its act of conveyance a trust which it has not declared, and which the United States was not under obligations to recognize.
A somewhat different phase of the question arises in regard to lot No. 11, one of the tier of lots which was purchased by the Mayor and Aldermen from other parties, for the purpose of perfecting the title to the site of the navy yard, it not being upon the alluvion which was the subject of the compromise deed. The consideration named in the conveyance of this lot to the Mayor and Aldermen, is one dollar, and the deed is absolute in form. It is claimed by the former owners that it was in reality a donation for the purpose of securing the construction of the navy yard at this point, and that the purpose of the donation having failed, a trust now results to the original proprietors.
*505 Assuming that this lot was in fact a donation, as claimed, the result does not follow. If. any such relation of trust existed, it was ended when the property was conveyed absolutely to the United States, as both parties intended it should be. Perhaps, as a general rule, the par'y who accepts a donation to enable him to accomplish a particular purpose, should, when his plans change, or the purpose fails, return the property to the donor; but if the gift be absolute, and the donee chooses to convey the property to a stranger, we know" of no power in the courts to compel him to do otherwise.
The decisions cited in argument, being based upon constructions of divers deeds, do not furnish any conclusive authorities to govern the construction of the one before us.
In Police Jury v. Reeves, 6 Martin, La., N. S., 221, the Court construed the conveyance to be upon condition that the Court-house of the Parish should be located upon the premises donated; and it was decided that this condition was not performed by the erection of a jail upon the premises, the county seat being then removed to another locality.
In Daniel v. Jacoway, 1 Freeman, ch. 59, the donation was to certain persons, members of the Board of Police, to hold “for the use and benefit of the County of Heshoba, for a county site for a Court-house.” A Courthouse was built, and the seat of justice established there for a few months, when the seat of justice was removed to another town. The Chancellor says: “The defendants took the land, not absolutely, but in trust, for the use and *506 benefit of tbe County of Neshoba, for a county site, Courthouse, etc. But the county for whose use it was conveyed, has refused to appropriate the land to the purposes expressed in the deed. Can the defendants, then, set up an absolute estate in themselves, when the trust upon which the land was conveyed has failed, and this too, by their own act?”
In the cases in 5 Pick., 528; 21 Pick., 215; 8 Mete., 238, and 11 Paige, 414, the conditions construed do not sufficiently resemble those before us as to throw much light upon our inquiry.
In Mead v. Ballard; 7 Wall, 290, it appeared that a grant was made upon. the express condition that the Lawrence Institute “shall be permanently located upon said lands; and on failure of such location being made on or before the 7th day of September, 1848, and on repayment of the purchase money, the land was to revert.” The Board of Trustees of the Institute passed a resolution on the 9th of August, 1848, locating the Institute on the land granted. The building was immediately commenced, and finished in 1849. These buildings were burned down in 1857, and never rebuilt. The grantor tendered repayment of the purchase money, and brought ejectment. It was held that the location intended by the parties must have been some act which was in its nature capable of being performed before the 7th of September, 1848; that when the officers of the Institute had passed their resolution locating the building on the land, with the intention that it should be the permanent place of- conducting the business of the corporation, they had permanently located *507 the Institute within the true construction of the contract, and that the subsequent destruction of the buildings, and abandonment of the site, did not divest the title.
Our conclusion is, that the city of Memphis, by the act of cession from the United States, acquired a valid title to the premises in controversy. The views we have expressed render it unnecessary to express an opinion as to many points raised in argument.
The decree of the Chancellor, dismissing the complainants’ bill, must be affirmed.